## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Scott Jeffrey Estep, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Ocwen Loan Servicing, LLC and | ) | **COMPLAINT** |
| Nationwide Credit, Inc., | ) | **WITH JURY TRIAL DEMAND** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

This action for damages is based on Defendants' unlawful and deceptive practices in connection with Defendants' efforts to collect a debt. Defendant's conduct involves the making of false and misleading representations to the Plaintiff and/or others, unfair practices, harassment and abuse, all in connection with Defendants' efforts to collect the debt. Plaintiff seeks monetary relief based on Defendants' violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq.

1

## PARTIES

1.      Plaintiff, Scott Jeffrey Estep, is a natural person who resides in Cherokee County, Georgia.

2.      Plaintiff is allegedly obligated to pay a consumer debt and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1692a(3).

3.      Defendant, Ocwen Loan Servicing, LLC (hereinafter "Ocwen"), is a limited liability corporation formed under the laws of the State of Delaware, headquartered in the State of Florida, and registered to do business in the State of Georgia. Ocwen may be served with process via its registered agent, Corporation Service Company, at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092-2924.

4.      Ocwen uses interstate commerce and/or mail in its business. The principal purpose of Ocwen's business is the collection of consumer debts. Ocwen also regularly collects, or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due, to a third party. Ocwen is, therefore, a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

2

5.     Defendant, Nationwide Credit, Inc. (hereinafter "Nationwide"), is a corporation formed under the laws of the State of Georgia. Nationwide may be served with process via its registered agent, Corporation Service Company, at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092-2924.

6.     Nationwide uses interstate commerce and/or mail in its business. The principal purpose of Nationwide's business is the collection of consumer debts. Nationwide also regularly collects, or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due, to a third party. Nationwide is, therefore, a "debt collector" as that term is defined by 15 U.S.C. § 1692a(6).

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction over Plaintiff's Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*., claims, pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d). Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over Defendants because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

9.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district. Pursuant to LR 3.1B(3), NDGa, venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

### Factual Allegations Derived from Plaintiff's Mortgage

10.     On or about August 16, 2006, Plaintiff obtained a loan from Harborside Financial Network, Inc. (hereinafter "Harborside") for the original principal amount of $36,900.00.

11.     The Mortgage was collateralized by residential real property located at 4812 Helga Way NE, Woodstock, Georgia 30188-4066, as evidenced by the Security Deed recorded at Deed Book 14376, Page 4012, in the Superior Court of Cobb County.

4

12.   Thereafter, the Mortgage was transferred from Harborside to Litton Loan Servicing, L.P. (hereinafter "Litton"), but no Assignment was filed in the Superior Court of Cobb County.

### Factual Allegations Derived from Plaintiff's Bankruptcy Case

13.   On July 22, 2011, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division, Case Number 11-71106 (the "Bankruptcy Case").

14.   In Schedule D of his Bankruptcy Petition, Plaintiff listed Litton as having a secured claim for the Mortgage in the amount of $35,343.68.

15.   On August 24, 2011, Litton filed a Proof of Claim in Plaintiff's Bankruptcy Case, Claim 3, representing it was owed $36,346.14, inclusive of $788.14 in arrearages.

16.   On September 30, 2011, Plaintiff filed his Chapter 13 Plan in accordance with 11 U.S.C. § 1322(b)(5), which stated in pertinent part, "This Plan anticipates the filing of a motion to treat the second mortgage held by Litton as unsecured due to a lack of equity available to secure the debt."

5

17.     On September 30, 2011, Plaintiff also filed a Motion to Value Collateral and Modify Rights of Litton Loan Servicing, L.P. Pursuant to 11 U.S.C. §506 and §1322 (the "Motion") (Doc. 19).

18.     On April 19, 2012, the Bankruptcy Court issued an Order (Doc. 38) Granting Plaintiff's Motion (the "Order").

19.     The Order stripped Litton of its security interest, ordered that Litton's claim be treated as a general non-priority unsecured claim, and ordered that effective upon entry of discharge, Litton's lien shall be avoided without further order.

20.     Litton was served with a copy of the Order on April 22, 2012, by the Bankruptcy Noticing Center.

21.     On May 24, 2012, Plaintiff's Plan was confirmed and became *res judicata* as to Plaintiff and Litton.

22.     Litton was served with a copy of the Confirmation Order on June 1, 2012, by the Bankruptcy Noticing Center.

23.     On August 15, 2014, the Bankruptcy Court received and filed a Notice of Transfer, assigning the Mortgage from Litton to Ocwen.

24.     The Mortgage was in default at the time it was assigned to Ocwen.

6

25.     On August 31, 2015, the Bankruptcy Court entered an Order Discharging Debtor in Plaintiff's Bankruptcy Case as to all dischargeable debts, which included the Mortgage, and the Bankruptcy Case was closed.

26.     On September 2, 2015, both Litton and Ocwen were served Notice by the Bankruptcy Noticing Center that Plaintiff's Bankruptcy Case was discharged.

27.     Upon discharge, Plaintiff had no personal liability for the Mortgage.

28.     Upon discharge, the bankruptcy discharge injunction contained in 11 U.S. Code § 524 prohibited the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset the Mortgage debt from Plaintiff.

**Factual Allegations Regarding Defendants' Efforts to Collect the Discharged Mortgage Debt, and Plaintiff's Prior Lawsuit**

29.     After Plaintiff's personal liability for the Mortgage debt was discharged in Plaintiff's Bankruptcy Case, Defendants continued to attempt to collect the discharged Mortgage debt.

30.     During the months of November 2015, December 2015, and January 2016, Ocwen sent Plaintiff "Mortgage Account Statements" and requests for payment via US Mail.

7

31.     The "Mortgage Account Statements" stated that the Mortgage had a past due balance of $16,869.88 that was "Due Now."

32.     Ocwen sent the "Mortgage Account Statements" and requests for payment in an attempt to collect the discharged Mortgage debt.

33.     In or around February 2016, Ocwen referred the Mortgage to Nationwide for collections, in furtherance of Ocwen's attempts to collect the discharged Mortgage debt.

34.     In referring the Mortgage to Nationwide for collection, Ocwen falsely represented to Nationwide that Plaintiff was still personally liable for the Mortgage debt.

35.     Thereafter, Nationwide continued to attempt to collect the discharged Mortgage debt from Plaintiff.

36.     On or about December 22, 2015, Plaintiff obtained a copy of his consumer report as published by Equifax.

37.     The Equifax report contained false and misleading information as provided by Ocwen. Specifically, the report showed that Ocwen was falsely reporting that the Mortgage had a balance of $15,991.00, a past due balance of

$1,877.00, a date of first delinquency of July, 2015, and was 120 days past due. A true and correct copy of the Ocwen Mortgage tradeline as it appeared in the December 22, 2015, Equifax report is as follows:

| Ocwen Loan Servicing, LLC   Attn: Research Dept 12650 Ingenuity Dr Orlando FL 32826-2703 - (800) 746-2936 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Account Number | Date Opened | High Credit | Credit Limit | Terms Duration | Terms Frequency | Months Revd | Activity Designator | | Creditor Classification | |
| 709043* | 08/16/2006 | $36,900 | | 30Y | Monthly | 48 | | | | |
| Items As of Date Reported | Balance Amount | Amount Past Due | Date of Last Paymnt | Actual Paymnt Amount | Scheduled Paymnt Amount | Date of 1st Delinquency | Date of Last Activity | Date Maj. Del. 1st Rprtd | Charge Off Amount | Deferred Pay Start Date | Balloon Pay Amount | Balloon Pay Date | Date Closed |
| 10/31/2015 | $15,991 | $1,877 | 05/2015 | | $375 | 07/2015 | | | | | | | |

Status - Over 120 Days Past Due; Type of Account - Mortgage; Type of Loan - Second Mortgage; Whose Account - Individual Account;  ADDITIONAL INFORMATION - Real Estate Mortgage; Second Mortgage; 120 Days Past Due;

| Account History with Status Codes | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09/2015 | 08/2015 | 07/2015 | 06/2015 | 05/2015 | 12/2014 | 11/2014 | 10/2014 | 09/2014 | 08/2014 | 07/2014 | 06/2014 | 05/2014 | 04/2014 | 03/2014 | 02/2014 | 01/2014 | 12/2013 | 11/2013 | 10/2013 | 09/2013 | |
| 3 | 2 | 1 | 2 | 1 | 2 | 4 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | |
| 08/2013 | 07/2013 | 06/2013 | 05/2013 | 04/2013 | 03/2013 | 02/2013 | 01/2013 | 12/2012 | 11/2012 | 10/2012 | 09/2012 | 08/2012 | 07/2012 | 06/2012 | 05/2012 | 04/2012 | 03/2012 | 02/2012 | 01/2012 | 12/2011 | |
| 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | |
| 11/2011 | 10/2011 | | | | | | | | | | | | | | | | | | | | |
| 4 | 3 | | | | | | | | | | | | | | | | | | | | |

38. Because the Mortgage was discharged in Plaintiff's Bankruptcy Case, the representation that Plaintiff was still personally liable for the Mortgage debt was both false and misleading.

39. In representing to Equifax that Plaintiff owed money for the discharged Mortgage debt, Ocwen's representations were false and blatant misrepresentation of the character, amount, and legal status of the discharged Mortgage debt.

40. Ocwen made the foregoing misrepresentations regarding the character, amount, and legal status of the discharged Mortgage debt to Equifax in furtherance of Ocwen's attempts to collect the discharged Mortgage debt.

41. Plaintiff disputed the debt directly to Equifax.

9

42.     Upon information and belief, Ocwen received notice of Plaintiff's dispute from Equifax.

43.     Ocwen failed to correct its false, deceptive, and misleading reporting.

44.     Ocwen continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage, in furtherance of Ocwen's attempts to collect the debt.

45.     On or about December 18, 2015, Plaintiff also obtained a copy of his consumer report as published by Experian.

46.     The Experian report contained false and misleading information as provided by Ocwen. Specifically, the report stated that the Mortgage had a balance of $15,991.00, a past due balance of $1,877.00, and was charged off.  A true and correct copy of the Ocwen Mortgage tradeline as it appeared in the December 18, 2015, Experian report is as follows:

**OCWEN LOAN SERVICING**
**Address:**                    **Account Number:**
1661 WORTHINGTON RD STE 100   709043....
WEST PALM BEACH, FL 33409
(800) 746-2936
**Address Identification Number:**
0065263884
**Status:**  Account charged off. $15,991 written off. $1,877 past   **Status Details:**  This account is scheduled to continue
due as of Nov 2015.                                    on record until Aug 2018.

**Date Opened:**          **Type:**                **Credit Limit/Original Amount:**
08/2006              Mortgage             $36,900
**Reported Since:**      **Terms:**               **High Balance:**
10/2011              30 Years             NA
**Date of Status:**      **Monthly Payment:**     **Recent Balance:**
11/2015              $0                   $15,991 as of 11/2015
**Last Reported:**       **Responsibility:**      **Recent Payment:**
11/2015              Individual           $0

47.     Because the Mortgage was discharged in Plaintiffs' Bankruptcy, the information described above was both false and misleading.

48.     In representing to Experian that Plaintiff owed money for the discharged Mortgage debt, Ocwen's representations were false and blatant misrepresentation of the character, amount, and legal status of the discharged Mortgage debt.

49.     Ocwen made the foregoing misrepresentations regarding the character, amount, and legal status of the discharged Mortgage debt to Experian in furtherance of Ocwen's attempts to collect the discharged Mortgage debt.

50.     Plaintiff disputed the debt directly to Experian.

11

51.     Upon information and belief, Ocwen received notice of Plaintiff's dispute from Experian.

52.     Ocwen failed to correct its false, deceptive, and misleading reporting.

53.     Ocwen continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage, in furtherance of Ocwen's attempts to collect the debt.

54.     Ocwen was served notice from the Bankruptcy Noticing Center that the Mortgage was discharged in Plaintiff's Bankruptcy Case.

55.     As such, Ocwen had actual knowledge that its representations to Plaintiff, Nationwide, Equifax, and Experian that Plaintiff was still personally liable for the Mortgage debt were false, deceptive, and misleading.

56.     In representing that Plaintiff owed money that he did not owe, Ocwen's representations were a false and blatant misrepresentations of the character, amount, and legal status of the discharged Mortgage debt.

57.     Ocwen made the misrepresentations regarding the character, amount, and legal status of the discharged Mortgage debt in furtherance of Ocwen's attempts to collect the discharged Mortgage debt.

12

58.    Despite having actual knowledge that Plaintiff's personal liability for the Mortgage was discharged in Plaintiff's Bankruptcy Case, Defendants continued to represent to Plaintiff and to third parties that Plaintiff was still personally liable for the Mortgage, and continued to attempt to collect the discharged Mortgage debt from Plaintiff.

59.    Accordingly, on July 5, 2016, Plaintiff filed suit against Ocwen and Nationwide for violations of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et seq*., violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, *et seq*., and violations of the Bankruptcy Discharge Injunction, 15 U.S.C. § 524, *et seq*. (the "Lawsuit").  *Scott Jeffrey Estep and Debra Lynn Estep v. Equifax Information Services, LLC, Experian Information Solutions, Inc., Ocwen Loan Servicing, LLC, Nationwide Credit, Inc., and Bank of America Corporation*, No. 1:16-cv-02419-ELR-LTW, 2016 U.S. Dist. (N.D. Ga. July 5, 2016).

60.    On October 11, 2016, while Plaintiff was engaged in settlement negotiations with Defendants, Plaintiff's counsel informed counsel for Defendants that, despite the lawsuit and ongoing settlement negotiations, Defendants were still

13

continuing to attempt to collect the discharged Mortgage debt, and were continuing to send collection letters.

61.     On September 16, 2016, counsel for Defendants informed Plaintiff's counsel via electronic mail that he was reviewing the issue with Ocwen.

62.     On December 9, 2016, Plaintiff settled his claims against Defendants in principle.

63.     On December 16, 2016, Plaintiff and Defendants filed a Joint Notice of Settlement with the Court. [Doc. 41]

64.     On December 28, 2016, Plaintiff executed a settlement agreement and release (the "SAR") with Defendants, and mailed the SAR to Defendants on January 4, 2017.

65.     On February 3, 2017, Defendants executed the SAR.

66.     On February 9, 2017, Plaintiff and Defendants filed a Stipulation of Dismissal with the Court. [Doc. 43]

### Factual Allegations Regarding Defendants' Post-Lawsuit Attempts to Collect the Discharged Mortgage Debt from Plaintiff

67.     Since Plaintiff's execution of the SAR on December 28, 2016, Defendants have continued to attempt to collect the discharged debt.

68.   On October 13, 2017, Plaintiff's counsel informed counsel that represented Defendants in the Lawsuit, via phone and electronic mail, that Defendants were continuing to attempt to collect the discharged Mortgage debt.

69.   Specifically, Plaintiff's counsel informed Defendants' counsel that Defendants had sent nine separate "Mortgage Account Statements" that each stated the Mortgage had a past due balance of $16,869.88 that was "Due Now."

70.   The nine "Mortgage Account Statements" were dated 01/23/2017, 02/22/2017, 03/22/2017, 04/24/2017, 05/22/2017, 06/22/2017, 07/24/2017, 08/22/2017, and 09/22/2017, and each requested payment, in furtherance of Defendants' attempts to collect the discharged Mortgage debt.

71.   Plaintiff's counsel also informed Defendants' counsel that Plaintiff's Trans Union consumer report dated May 05, 2017, showed that Ocwen was falsely reporting the discharged Mortgage debt to Trans Union as having an outstanding balance of $15,991 and a status of "Charged Off."   Plaintiff's counsel provided Defendants' counsel with a copy of the tradeline.

72.   The Ocwen tradeline appeared in the May 5, 2017, TransUnion report as follows:

**OCWEN LOAN SVCG LLC   #709043\*\*\*\***
1661 WORTHINGTON RDSTE 100
WEST PALM BEACH, FL 33409
(561) 682-8000

| Date Opened: | 08/16/2006 | Balance: | $15,991 | Pay Status: | >Charged Off< |
| Responsibility: | Individual Account | Date Updated: | 11/30/2015 | Terms: | $0 per month, paid Monthly |
| Account Type: | Mortgage Account | Payment Received: | $0 | | for 360 months |
| Loan Type: | SECOND | Last Payment Made: | 05/26/2015 | Date Closed: | 11/30/2015 |
| | MORTGAGE | High Balance: | $36,900 | | >Maximum Delinquency of 120 days in 11/2011 and in |
| | | Original ChargeOff: | $16,870 | | 10/2013 for $11,559< |
| | | Past Due: | >$15,991< | | |

Remarks: >UNPAID BALANCE CHARGED OFF<
Estimated month and year that this item will be removed: 06/2022

73.     On November 9, 2017, Defendants' counsel from the Lawsuit informed Plaintiff's counsel via electronic mail that Ocwen had assigned the matter to another law firm.

74.     Since informing Defendants' counsel from the Lawsuit of Defendants' continued collection attempts, Defendants have sent at least two more "Mortgage Account Statements" dated 12/22/2017, and 01/22/2017.  Both "Mortgage Account Statements" state that the Mortgage has a past due balance of $16,869.88 that is "Due Now."

75.   Defendants sent the 12/22/2017 and 01/22/2017 "Mortgage Account Statements" in furtherance of Defendants' attempts to collect the discharged Mortgage debt.

76.   Defendants continue to falsely represent to Plaintiff that he is still personally liable for the Mortgage debt.

77.   Defendants continue to falsely represent to third parties that Plaintiff is still personally liable for the Mortgage debt.

78.   Because the Mortgage was discharged in Plaintiffs' Bankruptcy Case, Defendants' statements and representations regarding the Mortgage described above were false, deceptive, and misleading.

79.   Defendants made the misrepresentations described above in connection with their attempts to collect the discharged Mortgage debt.

80.   Despite having actual knowledge that Plaintiff has no personal liability for the Mortgage debt, and that their representations regarding the character, amount, and legal status of the Mortgage are false, Defendants continue to make false representations to Plaintiff and to third parties in an attempt to coerce Plaintiff into making a payment.

81.   Accordingly, Defendants' conduct was willful.

## Factual Allegations Regarding Consumer Reports
## Containing Incorrect Information

82.   The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the following: a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to; the review or collection of an account of the consumer; the underwriting of insurance involving the consumer; determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; used by a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; used by a person who otherwise has a legitimate business need for the

18

information; used in connection with a business transaction that is initiated by the consumer; to review an account to determine whether the consumer continues to meet the terms of the account; and/or used by executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards. 15 U.S.C. §§1681a(d)(1) and 1681b(a)(3).

83.   The terms "consumer report," "credit report," and "consumer credit report" are used synonymously herein.

84.   The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Approximately two million consumer reports are issued by credit bureaus each day. See,

Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p 48-49, available at

*https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf*

(accessed November 16,2017)

85.     In 2012, Federal Trade Commission conducted a study regarding consumer credit reporting errors, and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade Commission, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p iv of Executive Summary, available at

*https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf* (accessed November 16,2017).

86.     The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry.  *Id*.

87.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major, because the impact of a change in score

is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure. *Id.* at i.

88.   Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See, *https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/* (accessed November 16, 2017).

**Factual Allegations Regarding Consumer Reports Containing Incorrect Information, and the Impact on Scoring**

89.   The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit scoring system, and utilizes data reported by credit reporting agencies. See, *https://www.myfico.com/credit-education/credit-scores/* (accessed November 16, 2017).

90.   The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.*

21

91.   The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p 53, available at

*http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf*, (accessed November 16, 2017).

92.   FICO scores are calculated from five main categories of credit data in a consumer's credit report.   Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score. See, *www.myfico.com/credit-education/whats-in-your-credit-score/*.

93.   The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the

opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

94.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

95.    Incorrectly reporting the tradeline of a mortgage – that was discharged in bankruptcy – with a $15,991 past due balance, Charged Off, and a $16,870 charge off amount, adversely affects Plaintiff's FICO score, because, at a minimum, it negatively misrepresents the debt/amounts owed accounts.

96.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

97.    Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

98.    Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including but not limited

to the length and age of credit history, and the use of certain types of credit. Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p 11, available at

*https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf*

(accessed November 16, 2017). As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010)

99.    Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay. *Id*., at 22.

100. Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See, *https://www.consumer.ftc.gov/articles/0152-credit-scores.*

24

101. The National Association of Insurance Commissioners (NAIC) is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories.  See, *http://www.naic.org/index_about.htm*.

102. The NAIC, advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score.  National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm

103. Outstanding debt accounts for 30% of a consumer's credit-based insurance score.  *Id*.

104. Incorrectly reporting the tradeline of a mortgage – that was discharged in bankruptcy – with a $15,991 past due balance, Charged Off, and a $16,870 charge off amount, adversely affects Plaintiff's credit-based insurance score, because, at a minimum, it negatively misrepresents the debt/amounts owed accounts.

**Injuries-in-Fact**

105.  Defendants' actions have resulted in the illegitimate suppression of Plaintiff's Fair Isaac Corporation ("FICO") credit score and other credit rating model scores.

106.  The adverse effect on Plaintiff's credit scores places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than he otherwise would.

107.  The Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of

26

establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc*., No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc*., No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

108. Defendants' actions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance score.

109.  The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than he otherwise would.

110.  Defendants' actions have caused Plaintiff's Trans Union credit report to falsely indicate to any viewer of the actual report that Plaintiff owes a $15,991 debt that Plaintiff does not owe.

111.  This false impression creates a material risk that Plaintiff will be denied credit, receive less favorable credit treatment than he otherwise would, or receive other unfavorable treatment than he otherwise would, from any viewer of Plaintiff's credit report engaged in judgment-based lending.

112.  The FDCPA provides consumers with "statutorily-created rights to be free from 'being subjected to false, deceptive, unfair, or unconscionable means to collect a debt.'" *McCamis v. Servis One, Inc*., No. 8:16-CV-1130-T-30AEP, 2016 U.S. Dist. LEXIS 99492 (M.D. Fla. July 29, 2016); *Church v. Accretive Health, Inc*., 654 Fed. Appx. 990, 2016 U.S. App. LEXIS 12414, 2016 WL 3611543 (11th Cir. 2016).

113. An injury-in-fact sufficient to satisfy Article III standing requirements "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Church*, at 993, quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S. Ct. 1114, 71 L. Ed. 2d 214 (1982).

114. Violation of statutory rights are not a "hypothetical or uncertain" injury, but one "that Congress has elevated to the status of a legally cognizable injury through the FDCPA.". *McCamis*, at 4, *citing Church*, at 3. Through the violation of his statutorily-created rights, Plaintiff has suffered an injury-in-fact sufficient to establish Article III standing.

## **Damages**

115. Despite having actual knowledge that the information it was reporting to Trans Union regarding Plaintiff and the Mortgage was false, deceptive, and misleading, Ocwen continued to report the false, deceptive, and misleading information to Trans Union.

116. Accordingly, Ocwen's conduct was willful.

29

117.  As a result of Ocwen's actions and omissions, Plaintiff's actual damages also include the illegitimate suppression of his Fair Isaac Corporation ("FICO") credit score and other credit rating model scores.

118.  The false information reported by Ocwen creates a material risk of financial harm to Plaintiff stemming from the decreased perception of Plaintiff's future creditworthiness.

119.  The statements made by Defendants in their "Mortgage Account Statements" was both false and misleading.

120.  The false and misleading "Mortgage Account Statements" were sent to Plaintiff in furtherance of Defendants' efforts to collect their Mortgage debt from Plaintiff.

121.  Defendants had actual knowledge that the "Mortgage Account Statements" were false and misleading, yet continued to send the false and misleading "Mortgage Account Statements."

122.  Accordingly, Defendants' conduct was willful.

123.  As a result of Defendants' willful actions and omissions, Plaintiff is eligible for statutory damages.

124.   Additionally, as a result of Defendants' actions and omissions, Plaintiff has suffered actual damages, including out-of-pocket expenses in challenging Defendants' wrongful representations, as well as frustration and anxiety resulting from Defendants' unyielding attempts to collect the discharged Mortgage debt.

## CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT
15 U.S.C. §§ 1692e, 1692e(2), and 1692e(10) – Ocwen Loan Servicing, LLC**

125.   Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

126.  Ocwen's provision of false and/or misleading information to TransUnion in connection with its attempts to collect the alleged Mortgage debt violated multiple provisions of the FDCPA, including but not limited to limitation 15 U.S.C. §§ 1692e, 1692e(2), 1692e(8), 1692e(10), and 1692f.

127.   As a result of Ocwen's violations of the FDCPA, Plaintiff has suffered actual damages as described *supra*. Plaintiff is, therefore, entitled to recover actual damages under 15 U.S.C. § 1692k.

128.  Under 15 U.S.C. § 1692k, Plaintiff is also entitled to recover $1,000.00 in statutory damages and reasonable attorney's fees and costs from Defendants.

## COUNT II

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT 15 U.S.C. §§ 1692e, 1692e(2), and 1692e(10) – Ocwen Loan Servicing, LLC, and and Nationwide Credit, Inc.

129.  Plaintiff incorporates by reference paragraphs 1 through 126 as though fully stated herein.

130. Defendants' attempts to collect the discharged Mortgage debt by sending "Mortgage Account Statements" that misrepresented the amount and legal status of the Mortgage debt, and requested payment from Plaintiff, violated multiple provisions of the FDCPA, including but not limited to 15 U.S.C. §§ 1692e, 1692e(2), 1692e(8), 1692e(10), and 1692f.

131. As a result of Defendants' violations of the FDCPA, Plaintiff has suffered actual damages. Plaintiff is therefore entitled to recover actual damages under 15 U.S.C. § 1692k.

132. Under 15 U.S.C. § 1692k, Plaintiff is also entitled to recover $1,000.00 in statutory damages and reasonable attorney's fees and costs from Defendants.

## **TRIAL BY JURY**

133.  Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants,

jointly and severally, for:

a.) Plaintiff's actual damages;

b.) Statutory damages pursuant to 15 U.S.C. § 1692k;

c.) Such other and further relief as may be just and proper.

Respectfully submitted this 23rd day of February, 2018.


**BERRY & ASSOCIATES**

*/s/ Paul J. Sieg*
Matthew T. Berry
Georgia Bar No.: 055663
*matt@mattberry.com*
Paul J. Sieg
Georgia Bar No.: 334182
*psieg@mattberry.com*
2751 Buford Highway, Suite 600
Atlanta, GA 30324
Ph. (404) 235-3334
Fax (404) 235-3333

*Plaintiff's Attorneys*

33